## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AVIVA MEYER, Derivatively on behalf of Nominal Defendant RENOVACARE, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>HARMEL S. RAYAT, THOMAS BOLD, KAIYO NEDD, ROBERT W. COOK, ALAN L. RUBINO, KENNETH KIRKLAND, and STEVE YAN-KLASSEN,<br><br>     Defendants,<br><br>- and -<br><br>RENOVACARE, INC.,<br><br>     Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Aviva Meyer, by and through undersigned counsel, brings this action derivatively on behalf of Nominal Defendant RenovaCare, Inc. ("RenovaCare" or the "Company"), a Nevada corporation, against certain of its directors and officers. The allegations below are made upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters, based upon review of: (a) information publicly disseminated by RenovaCare, including its public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, and postings on its website; (b) news reports and other publicly available sources; and (c) court dockets,

filings, and orders related to litigation involving RenovaCare pending in federal court, including a complaint captioned *Securities and Exchange Commission v. Rayat, et al.*, Case No. 1:21-cv-04777-LJL (S.D.N.Y.) (the "SEC complaint").

## NATURE OF ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant RenovaCare against certain of its officers and directors. This action seeks to recoup losses that RenovaCare has sustained and will sustain due to the misconduct of the Individual Defendants named herein.

2.      RenovaCare holds itself out as a biotechnology company focused on developing "first-of-their-kind autologous (self-donated) stem cell therapies for the regeneration of human organs." RenovaCare states that it focuses on therapies for skin treatment. This includes a liquid called CellMist™ ("CellMist") which is sprayed onto wounds by the Company's SkinGun™ ("SkinGun") application system. RenovaCare also claims to be developing medical-grade liquid spray devices for wound care and irrigation fluids.

3.      On or about May 28, 2021, the SEC filed a civil lawsuit against RenovaCare and its chairman and controlling shareholder, Defendant Harmel S. Rayat ("Rayat"), for an alleged scheme to generate interest in the Company's stock through the placement of paid promotional materials designed to look like independent analyst reports.

4.      The SEC alleges that RenovaCare and Rayat assisted in developing these promotional materials, which included false and misleading statements about RenovaCare's business and prospects and paid for them through intermediaries in a deliberate effort to conceal the true source of the funds. The promotional materials ran between October 2017 and at least January 2018 and correlated with a sharp rise in the price of RenovaCare stock from approximately $3 per share to approximately $9 per share in February 2018.

5.      RenovaCare is not listed on a traditional stock exchange, but rather trades "over-the-counter" ("OTC") in a market supervised by an entity named OTC Markets Group, Inc. ("OTC Markets").  In January 2018, OTC Markets learned of possible improprieties related to the Company's promotional activities and requested an explanation from the Company. In response, RenovaCare and Rayat issued a press release stating that they had investigated the issue, but denying any involvement in the scheme. As alleged in the SEC complaint, the press release issued by RenovaCare contained numerous false statements, as described below.

6.      The revelations in the SEC complaint and their fallout have severely damaged shareholder value. The stock declined precipitously in the wake of the May 28, 2021 disclosures and the stock now trades at just $0.36 cents per share. The Company has been exposed to regulatory liability as well as to potentially massive damages in securities class action litigation that has also been filed against the

Company. In this action, Plaintiff seeks to hold the Company's fiduciaries accountable for these damages and to disgorge any improper benefits.

7.    As alleged herein, a shareholder demand on the board of RenovaCare to bring the asserted claims is excused for futility.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has exclusive jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78(aa), because plaintiff's claims arise under Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4.

9.    This Court has supplemental jurisdiction over Plaintiff's state-law claims in accordance with 28 U.S.C. § 1367.

10.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.    This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because: (a) one or more of the Defendants either resides in or maintains offices in this District;

and (b) a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

**Plaintiff**

13.    Plaintiff Aviva Meyer ("Plaintiff") is a current holder of 4,361 shares of RenovaCare stock and has held RenovaCare stock continuously since 2016.

**Nominal Defendant**

14.    Nominal Defendant RenovaCare, Inc. ("RenovaCare") is a Nevada corporation with its principal executive offices located at 9375 E. Shea Blvd., Suite 107-A, Scottsdale, Arizona, 85260. From 2020 to approximately July 2021, its principal executive offices were located at 4 Becker Farm Road, Suite 105, Roseland, New Jersey, 07068. Prior to that, including during the time period at issue, its principal executive offices were located at 430 Park Avenue, New York, New York.

15.    RenovaCare's common stock trades on the over-the counter ("OTC") under the symbol "RCAR."

**Individual Defendants**

16.    Defendant Harmel S. Rayat ("Rayat") was the Chairman of the Board of RenovaCare from March 2018 to October 2020 and was reappointed to the position in March 2021. Rayat also served as Chief Executive Officer ("CEO") from

June 2018 to November 2019. Rayat is the President and CEO of Kalen Capital Corporation, Rayat's family office investment company, which at relevant times owned over 70% of the Company's stock. According to RenovaCare's public statements, Rayat has invested over $20 million in the Company since 2013.

17.    Defendant Thomas Bold ("Bold") was the Company's CEO from December 2013 to June 2018 and the Company's interim Chief Financial Officer ("CFO") from September 2016 to October 2018. During the fiscal years ended December 31, 2017, 2018 and 2019, the Company recognized expenses related to defendant Bold's consulting services and for his performance as CFO of $378,700, $100,000, and $43,000 respectively.

18.    Defendant Kaiyo Nedd ("Nedd") was appointed to the board on March 16, 2021 and was appointed President and CEO on March 26, 2021.

19.    Defendant Robert W. Cook ("Cook") was the Company's CFO and Secretary from June 22, 2020 until his resignation on April 7, 2021. For the fiscal year ended December 31, 2020, Cook received $220,000 in compensation.

20.    Defendant Alan L. Rubino ("Rubino") was the Company's President, CEO, and Chairman of the Board from November 2019 to March 25, 2021. For the fiscal years ended December 31, 2019 and 2020, Rubino received $2,766,344 and $2,141,544, respectively, in compensation.

21.    Defendant Kenneth Kirkland ("Kirkland") was a director of the Company from August 2013 to March 2021.  For the fiscal years ended December 31, 2017, 2018, 2019, and 2020, Kirkland received $254,700, $6,000, $6,000 and $13,000, respectively, in compensation.

22.    Defendant Steve Yan-Klassen ("Yan-Klassen") was the CFO of the Company from October 2018 to June 2020. For the fiscal years ended December 31, 2018 and 2019, Yan-Klassen received $5,000 and $23,000 in compensation.

23.    Each Defendant named above (collectively the "Individual Defendants"), by virtue of his management, executive, and/or directorship positions with RenovaCare, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts.  The Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial results of RenovaCare.

24.    The Individual Defendants were required to supervise the preparation of RenovaCare's public filings and approve any reports, such as press releases and SEC filings, concerning RenovaCare's financial condition. The Individual Defendants were prohibited from engaging in unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to RenovaCare.

25.    Each Individual Defendant directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that misleading statements were being issued regarding the Company's operating performance and internal controls, and approved or ratified these statements.

26.    Because of each Individual Defendant's positions with RenovaCare, each knew and had access to non-public information about the business of RenovaCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof, and reports and other information provided in connection therewith.

27.    The Individual Defendants knew, or recklessly disregarded, that the statements about RenovaCare were false and misleading when made. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding the Company.

28.    Because of their positions and access to material non-public information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being

concealed from, shareholders and investors, and that the positive representations that were being made were false and misleading.

29.    Because of their positions of control and authority as directors and/or officers of RenovaCare, the Individual Defendants were able to and did, directly and/or indirectly, remain informed as to the status of RenovaCare's operations, and upon receipt of notice or information of imprudent or unsound business practices, were required to make a reasonable inquiry, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### A.    The SEC Enforcement Action.

30.    RenovaCare is a development stage company. It has not generated revenue since its inception and has no commercialized products. The Company's activities consist primarily of research and development, business development, and raising capital. Rayat is the Company's controlling shareholder.

31.    RenovaCare describes itself as developing new generation "autologous stem cell therapies for the regeneration of human organs and tissues." According to its website, the Company's "initial product under development targets the body's largest organ, the skin."  The Company's CellMist technology facilitates "rapid

healing of wounds or other afflicted tissues when applied topically as a gentle cell mist" through the SkinGun system.

32.    On May 28, 2021, the SEC issued a Litigation Release captioned "SEC Charges Company and Controlling Shareholder with Fraud." According to the SEC complaint filed that same day in the U.S. District Court for the Southern District of New York, in or about July 2017, Rayat, on behalf of RenovaCare, solicited StreetAuthority, an online financial publisher of investment newsletters with a dedicated subscriber base, to run a promotional campaign for RenovaCare and "Company A," another company in which Rayat was the controlling shareholder.

33.    According to the SEC complaint, Rayat wanted to increase RenovaCare's stock price and trading volume, which would benefit him and his close associates who owned the Company's stock. Rayat allegedly worked closely with StreetAuthority to design the campaign. Among other things, Rayat reviewed the promotional materials, and provided StreetAuthority with information on the Company, including false information regarding the efficacy of the SkinGun, the Company's experimental medical device for treating burn wounds.

34.    According to the SEC complaint, Rayat also arranged for RenovaCare to pay StreetAuthority $50,000 per month for the promotion, and arranged for the payments to be made through third parties for the fraudulent purpose of concealing Rayat's and the Company's involvement in the promotion. The SEC complaint

details Rayat's extensive dealings with StreetAuthority, including communications with StreetAuthority about the substance of the campaign and personal meetings at StreetAuthority's offices to discuss it.

35.    According to the SEC complaint, in the course of these dealings, Rayat stated that "nothing would make me happier than working with [StreetAuthority] in spreading the word to investors and dramatically improving [RenovaCare's and Company A's] awareness in the investment community, which I wholeheartedly believe will help the companies raise additional capital and get senior listings, which in turn will allow institutional investors to jump in."

36.    According to the SEC complaint, the owner of StreetAuthority and Rayat orally agreed that StreetAuthority would receive payments of $100,000 per month to run the promotion. StreetAuthority agreed to use that money to pay for advertising and other distribution costs relating to the publication and dissemination of its promotion of RenovaCare and Company A, including a "Predictions Report." However, Rayat arranged for these payments to be made through a third-party investor relations company, identified by the SEC as "Investor Relations Company A." Rayat allegedly devised this payment scheme on behalf of RenovaCare to conceal from investors that RenovaCare was, in fact, paying StreetAuthority for the promotion.

37.    According to the SEC complaint, Rayat knew that StreetAuthority would have to disclose in its promotional materials any payments RenovaCare made to StreetAuthority. Rayat's payment arrangement that concealed the Company's involvement had the effect of "reducing investor skepticism" regarding the truthfulness of the campaign by making it appear to investors that StreetAuthority was offering an objective and fair assessment of RenovaCare's stock. According to the SEC complaint, RenovaCare's CEO, Defendant Bold, approved all of the payments from RenovaCare to the StreetAuthority intermediary.

38.    According to the SEC complaint, StreetAuthority publicly released the RenovaCare promotion on or about October 24, 2017. StreetAuthority disseminated the promotional materials in emails to its subscriber base, as well as on the internet more broadly in banners, advertisements on internet search engines, social media sites, and other internet platforms.

39.    According to the SEC complaint, Rayat actively worked with StreetAuthority to create StreetAuthority's promotional materials, regularly providing information to StreetAuthority to use for its promotion, and he reviewed and commented on draft materials prior to their release. These materials claimed that the SkinGun was a "revolutionary wound-healing device" and encouraged investors to buy RenovaCare stock and hold it for "10, 20x, even 40x gains." StreetAuthority's

promotional materials described one case study in particular of a patient who had severe burns that the SkinGun purportedly healed in days.

40.    However, according to the SEC complaint, the case study was riddled with falsehoods, including phony "before and after" pictures of the patient's supposed recovery, provided by Rayat. The SEC cited an internal corporate report from as early as 2014, which had been shown to Rayat, stating that the subject patient's arm suffered from complications and had taken months to heal. That report contained accurate pictures illustrating the actual results of the treatment, and not the pictures that Rayat later sent to StreetAuthority.

41.    According to the SEC complaint, StreetAuthority's promotional materials also claimed that the SkinGun could soon be approved by the U.S. Food and Drug Administration ("FDA") and that RenovaCare had "submitted a 510(k) filing to the FDA, which permits the marketing of a medical device. Now it's just a matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country." However, no such 510(k) filing was pending.

42.    According to the SEC complaint, from October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base. During this period, Rayat continued to edit such materials and give directions to StreetAuthority on how it could more effectively run the campaign.

43.    According to the SEC complaint, "the promotional campaign that Rayat solicited, concealed the payments for, and worked closely with StreetAuthority to create and distribute was a success" and StreetAuthority's content generated "tens of thousands" of clicks. In addition, RenovaCare stock trading volume and price increased significantly at this time. October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase.

44.    According to the SEC complaint, on or around January 2, 2018, OTC Markets, which supervised the market in which RenovaCare's stock was quoted, learned of StreetAuthority's promotion of RenovaCare. OTC Markets had a strict disclosure policy regarding such promotions to protect the integrity of the OTC markets. As a result, companies that violate the disclosure policies can be removed from the market and/or relegated to less attractive markets, which could have a material impact on trading volume and negatively impact the stock price.

45.    According to the SEC complaint, on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the Company make public disclosures relating to StreetAuthority's promotional campaign, with specific instructions on the disclosures RenovaCare needed to make to the market about its participation in StreetAuthority's campaign. Rayat was the individual primarily responsible at

RenovaCare for the press release issued in response to the demand made by OTC

Markets, and had primary authority and control over its drafting and dissemination.

46.    RenovaCare issued the press release on January 8, 2018 and a copy was

filed with the SEC via Form 8-K, signed by Defendant Bold. It stated as follows:

> [O]n January 3rd, 2018, OTC Markets Group Inc. ("OTC Markets") informed the Company that OTC Markets had become aware of promotional activities concerning the Company.
>
> OTC Markets provided an example, dated January 2nd, 2018, of the promotional material for reference. It is the Company's understanding that the material provided was part of an annual predictions report used in part to generate new subscribers for various newsletters owned by StreetAuthority LLC, an independent publisher founded in 2001. ***The Company had no editorial control over the content*** and was one of thirteen companies independently selected, researched and mentioned. The annual predictions report was disseminated during the last quarter of 2017. During this time, 2,190,000 shares traded, only 2% more than the average quarterly volume of 2,139,375 shares during all of 2017.
>
> Subsequently, later in the 4th quarter, a material announcement regarding a failed challenge to a RenovaCare patent was made public. On December 20th, 2017, a press release was issued by Avita Medical Limited disclosing that its petition for an Inter Partes Review with the Patent Trial and Appeal Board ("PTAB") to invalidate all claims in U.S. Patent No. 9,610,430 (owned by the Company) was denied. This press release was followed by an article in Stockhead on December 21st, 2017, which more fully reported on the PTAB denying Avita Medical Limited's petition, and, thereby, upholding the patentability of RenovaCare's technology.
>
> After the issuance of Avita Medical's press release and the follow-up article in Stockhead on December 21st, 2017, the trading volume of the Company's common stock increased 84% to 62,829 shares per day between December 20th and December 29th, versus 32,720 per day previously between December 1st through December 19th, 2017.

*The Company is not affiliated in any way with the authors of the annual predictions report or its publisher.* The Company issues press releases in the regular course of business and includes in its filings (the "SEC Filings") with the Securities and Exchange Commission (the "SEC") the material business activities of the Company, and investors are encouraged to rely on the information provided directly by the Company in such press releases and SEC Filings.

*In the report, the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading*, even though the report has significantly simplified the descriptions of the clinical indications and outcomes related to the use of the Company's cell spray for the treatment of burns and wounds, and used promotional, advisory and superfluous language in describing the Company, its products and its stock. Moreover, the author comments on the Company's interaction with the U.S. Food and Drug Administration and the performance of RenovaCare's stock. The Company does not know the basis for such opinions or conclusions arrived-at by the author. Investors are reminded to rely upon the Company's own statements, press releases, and filings with the SEC for information related to these matters.

Following notification from OTCQB Markets, the Company immediately made inquiries of its executive officers, directors, controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities) and third-party service providers regarding their involvement in the creation or distribution of promotional materials related to the Company and its securities.

*To the Company's knowledge, the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly:* **not** been involved in any way (including payment of a third- party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities; and **not** sold or purchased (other than in than in private placements conducted by the Company as described below) any shares of common stock of the Company within the last 90 days. The Company's former service provider, Inspiren Media LLC, originally acquired 5,000 shares of the Company on July 25th, 2008 and sold on January 3rd, 2018, after termination of its

agreement with the Company. All activity in the Company's common stock by the Company's executive officers, directors and controlling shareholders has been disclosed by such officer, director and shareholder in the Company's SEC Filings.

The Company was not involved in the creation, or directing the dissemination, of the report. Through its investor relations agencies, the Company paid $90,005.25 between October 24th, 2017 and January 2nd, 2018, as part of its contractual agreement to pay for out of pocket costs, including reimbursement of dissemination related costs, incurred by the investor relations agency.

[emphasis supplied].

47.    Based on its investigation, the SEC alleges that the foregoing press release contained numerous material misrepresentations and omissions that concealed Rayat's and RenovaCare's involvement in drafting the press release. According to the SEC complaint:

   a.   "First, the January 8 Press Release stated that RenovaCare conducted an inquiry of all relevant persons, including controlling shareholders such as Rayat, "regarding their involvement in the creation or distribution of promotional materials," and stated that "the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities." (emphasis in original). This statement was materially false. Rayat was involved in the creation of StreetAuthority's promotional materials by providing information to StreetAuthority from the outset and reviewing and commenting on drafts before and during the promotion. Rayat was also involved in the distribution of StreetAuthority's promotional materials by consulting with StreetAuthority on several occasions concerning its distribution strategy and suggesting and approving changes to the promotion that StreetAuthority implemented. In addition, Rayat,

RenovaCare's CEO, and the company's third-party investor relations consultants were all involved in the distribution of StreetAuthority's promotional materials by arranging for and working together to pay StreetAuthority $50,000 per month to cover StreetAuthority's distribution costs for the promotion."

b. "Second, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher." This was materially false. RenovaCare was affiliated with StreetAuthority because the company was paying StreetAuthority $50,000 per month to run StreetAuthority's promotion, including its annual Predictions Report. The company was also affiliated with StreetAuthority because Rayat had been working closely with StreetAuthority on the promotion as RenovaCare's agent."

c. "Third, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of StreetAuthority's RenovaCare-related promotional materials. This was materially false. Rayat, acting as an agent for the company, reviewed and commented on StreetAuthority's promotional materials before and throughout StreetAuthority's promotional campaign, and on several occasions, StreetAuthority incorporated Rayat's changes before publicly releasing the promotional materials."

d. "Fourth, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [the Predictions Report]." This statement was materially false. Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report by providing information to StreetAuthority to include in the report and by reviewing and commenting on drafts before and during the promotion. Rayat, on behalf of RenovaCare, was also involved in directing the dissemination of the report by discussing StreetAuthority's plan for disseminating the promotional materials and suggesting and approving changes to its dissemination on several occasions. In addition, RenovaCare provided StreetAuthority the funding for the dissemination of StreetAuthority's promotional materials."

    e.   "Fifth, the January 8 Press Release contained material omissions, including specific information required by OTC Markets, that, if addressed, would have required Rayat and RenovaCare to admit to some awareness and involvement in StreetAuthority's campaign. OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities," and yet the company failed to disclose that Rayat, on behalf of the company, was aware of the campaign since at least July 2017, and that RenovaCare's CEO was aware of the campaign by at least November 2017 when he authorized RenovaCare to pay Investor Relations Company A for expenses relating to the promotion."

48.    According to the SEC complaint, on February 26, 2018, OTC Markets downgraded RenovaCare's stock and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's profile due to the on-going promotional activity, causing the stock price to plummet.

49.    The SEC further alleges that Rayat and certain associates sought to personally profit from the StreetAuthority scheme. For example, at the outset of the scheme, Rayat allegedly engaged in a warrant exercise and stock purchase to acquire RenovaCare stock at below-market prices, and then tried to sell 500,000 shares into the inflated market. Similarly, an associate of Rayat purchased 900,000 shares of the Company directly from the Company at below-market prices as the scheme began. Also, a "long-time friend and the office manager of Rayat's real estate firm" sold millions of RenovaCare shares into the inflated market.

50.    In addition, the Company filed a Registration Statement with the SEC in January 2018, during the height of the promotional scheme, seeking to register

the Company's stock for sale, including 2.4 million shares personally owned by Rayat.

**B.    RenovaCare's False and Misleading Statements.**

51.    In addition to the January 8 press release, the Company's SEC filings dating back to October 2017, when the StreetAuthority promotion began, and through the date of the filing of the SEC complaint, were false and misleading by failing to disclose Rayat's fraudulent scheme involving StreetAuthority and the Company's history of false and misleading statements.

52.    In particular, from November 14, 2017 through the filing date of the SEC complaint, the Company filed 11 Forms 10-Q that failed to disclose the improper StreetAuthority promotional scheme. This included the Form 10-Q dated November 14, 2017 (signed by Defendant Bold); May 14, 2018 (signed by Defendant Bold); August 9, 2018 (signed by Defendant Rayat); November 19, 2018 (signed by Defendant Rayat); May 15, 2019 (signed by Defendant Rayat); July 31, 2019 (signed by Defendant Rayat); November 14, 2019 (signed by Defendant Rayat); June 22, 2020 (signed by Defendant Rubino); August 13, 2020 (signed by Defendant Rubino); November 13, 2020 (signed by Defendant Rubino); and May 7, 2021 (signed by Defendant Nedd).

53.    Similarly, from March 13, 2018 through the filing date of the SEC complaint, the Company filed 4 Forms 10-K that failed to disclose the improper

StreetAuthority promotional scheme and failed to disclose that the abject failures in the Company's internal control environment caused the issuance of false and misleading statements. This included the Form 10-K filed on March 13, 2018 (signed by Defendants Bold and Kirkland); April 12, 2019 (signed by Defendants Rayat, Kirkland and Yan-Klassen); May 14, 2020 (signed by Defendants Rubino, Yan-Klassen, Rayat, Rubino, and Kirkland); and March 31, 2021 (signed by Defendants Cook, Rayat, and Nedd).

54.    Each of the aforementioned Forms 10-Q and Forms 10-K contained false and misleading certifications of the Chief Executive Officer and Chief Financial Officer pursuant to the Sarbanes-Oxley Act of 2002, Rule 13a-14(a), attesting that, "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

## DAMAGES TO THE COMPANY

55.    The conduct of the Individual Defendants has severely damaged the Company.

56.    Damages include huge loss of shareholder value due to massive stock declines and costs already incurred, and to be incurred, defending the securities class

action litigation pending against the Company in the U.S. District Court for the

District of New Jersey, captioned *In re RenovaCare, Inc. Securities Litigation*,

Case No. 2:21-cv-13766-BRM-ESK (D.N.J.), and the SEC enforcement action.

57.    In addition, RenovaCare's business, goodwill, and reputation with its

business partners, regulators, and shareholders have been gravely impaired. The

credibility and motives of management are now in serious doubt.

58.    The Company also faces regulatory exposure in the SEC enforcement

action to fines and/or penalties, a serious threat for any public company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59.    Plaintiff brings this action derivatively in the right and for the benefit

of RenovaCare pursuant to Federal Rule of Civil Procedure 23.1, to redress injuries

suffered and to be suffered by the Company as a direct result of the Individual

Defendants' violations of their fiduciary obligations. RenovaCare is named solely as

a Nominal Defendant.

60.    Plaintiff will adequately and fairly represent the interests of

RenovaCare in enforcing its rights. Plaintiff has retained counsel experienced in

shareholder litigation. Plaintiff was a stockholder of RenovaCare during the period

of wrongdoing complained of and has continuously been a shareholder since that

time, and is a current RenovaCare shareholder.

61.    Plaintiff has not made a pre-suit demand on the RenovaCare board to institute this action because such a demand would be a futile and useless act, and, therefore, is excused. RenovaCare is controlled by its board, which at the time this action was commenced, consisted of two (2) members (Rayat and Nedd), each of whom is named as a Defendant herein.

62.    Rayat faces a substantial likelihood of liability for breach of fiduciary duty. Rayat personally orchestrated the promotional scheme involving StreetAuthority and engaged in a deliberate campaign to mislead shareholders and the market. Rayat: (a) made false and misleading statements to shareholders and the market; (b) allowed the false and misleading statements provided to shareholders and the market; (c) failed to implement, maintain, and monitor appropriate internal controls over the Company's operations and the public release of information to shareholders and the market.

63.    Based on said conduct, Rayat has been sued by the SEC for violations of the federal securities laws. These claims remain in ongoing litigation as of the date of the filing of this complaint, where Rayat faces a substantial likelihood of liability. One half of the board  is therefore personally conflicted with respect to considering a shareholder demand. Rayat could not in good faith pursue the Company's claims while defending himself against claims in an SEC enforcement

action based on similar facts, and which exposes him personally to regulatory liability.

64.    Rayat is also named as a defendant in the securities class action litigation for violations of the federal securities laws. *See In re RenovaCare, Inc. Securities Litigation*, Case No. 2:21-cv-13766-BRM-ESK (D.N.J.). Similar to the SEC enforcement action, these claims remain in ongoing litigation as of the date of the filing of this complaint, where Rayat faces a substantial likelihood of liability for his actions. Rayat is therefore personally conflicted with respect to considering a shareholder demand. Rayat could not in good faith pursue the Company's claims while defending himself against claims in another case based on similar facts, and which expose him personally to massive class action liability.

65.    The pendency of the securities class action claims for violating the federal securities laws renders it impossible for Rayat and Nedd to objectively and impartially consider a stockholder demand as to the wrongdoing alleged herein. If the Company pressed forward with its rights of action in this case, then the Company's efforts would undercut or even compromise the defense and settlement of the securities class action, making demand futile. Thus, Rayat and Nedd are neither independent of, nor disinterested in, the outcome of this shareholder derivative litigation and demand is accordingly futile and therefore excused.

66.    Pursuant to their duties as board members, Rayat and Nedd, comprising the entire board, had a duty to ensure that sufficient internal controls were in place, and to monitor the Company's compliance with those controls. As alleged herein, these Defendants utterly failed to ensure that the Company had sufficient internal controls in place and failed to ensure that the Company complied with any internal controls that it did have.

67.    In fact, these Defendants personally participated in the misconduct by signing false and misleading statements issued to shareholders and the SEC. These Individual Defendants face a substantial likelihood of liability as a result, excusing demand.

68.    Demand is further excused because Nedd lacks independence from Rayat. As CEO, Nedd's position and livelihood, which are material to him, depend upon the good graces of Rayat, the controlling shareholder who is interested in the subject matter of this litigation. Nedd only recently joined the Company and was personally selected by Defendant Rayat to serve as a director. Indeed, the Company's 2020 Form 10-K states that Rayat beneficially owns approximately 72.05% of RenovaCare stock, which means he can "exercise significant influence or control over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, which will have

significant control over our management and policies." Nedd's lack of independence suffices to excuse demand.

69.    In addition, by virtue of his attendance at Board meetings where adverse material inside information regarding the Company was presented and discussed, Nedd knew that the Company had made, and was making, false and misleading statements to shareholders and the market, yet he failed to halt or prevent these breaches of fiduciary duty.

70.    Demand is further excused because, although RenovaCare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, the board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for RenovaCare any part of its damages.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY

71.    Plaintiff incorporates by reference the allegations set forth above.

72.    Each of the Individual Defendants as current or former RenovaCare officers and/or directors, owe (or owed) the Company the fiduciary duties of due care and loyalty, and duties of candor and oversight.  By virtue of their positions as RenovaCare directors and/or officers, the Individual Defendants at all relevant times

had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein.

73.    Each of them was required to: (a) use his ability to control and manage RenovaCare in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of RenovaCare rather than his own interests.

74.    The Individual Defendants violated their fiduciary duties of care and loyalty owed to the Company.

75.    The Individual Defendants breached the duty of candor and disclosure by making false and misleading statements to shareholders.

76.    The Individual Defendants breached their duties of care and loyalty by failing to exercise proper oversight over RenovaCare and its internal control practices and procedures.

77.    The Individual Defendants knew of red flags regarding the decrepit state of RenovaCare's internal control environment, which they acknowledged in SEC filings, yet failed to take steps to remediate the problems notwithstanding being on notice of them.

78.    RenovaCare has been injured by reason of the Individual Defendants' conduct.

## COUNT II
## UNJUST ENRICHMENT

79.    Plaintiff incorporates by reference the allegations set forth above.

80.    By their wrongful acts and omissions, certain of the Individual Defendants were unjustly enriched at the expense and to the detriment of RenovaCare.

81.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to the Company.

82.    Plaintiff seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation improperly obtained by the Individual Defendants.

83.    Plaintiff, on behalf of RenovaCare, has no adequate remedy at law.

## COUNT III
## CONTRIBUTION AND INDEMNIFICATION
### (Section 21D of the Securities Exchange Act of 1934)

84.    Plaintiff incorporates by reference the allegations set forth above.

85.    Certain Defendants named herein are named as defendants in the related securities class action litigation. The conduct of these Defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

86.    The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If RenovaCare is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

87.    The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

88.    As officers and directors, the Individual Defendants had the power and ability to, and did, control or influence, either directly or indirectly, RenovaCare's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, and other securities laws.

89.    The Individual Defendants are liable under Section 21D of the Securities Exchange Act of 1934, which governs the application of any private right of action for contribution asserted thereunder.

90.    The Individual Defendants have damaged the Company and are liable to the Company for contribution and/or indemnification.

91.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring that the Individual Defendants breached their fiduciary duties to RenovaCare;

B.    Entering judgment against the Individual Defendants directing them to account to RenovaCare for all damages sustained by RenovaCare by reason of the wrongs alleged herein;

C.    Awarding Plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees and the reimbursement of expenses;

D.    Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including: (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, including, but not limited to, the addition of at least three new independent directors, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that Plaintiff has an effective remedy; and

E.    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.


Date: January 28, 2022

*/s/ Anthony M. Christina*
David Harrison (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
dharrison@lowey.com

Anthony M. Christina (NJ ID# 196262016)
William J. Olson (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
achristina@lowey.com
wolson@lowey.com

Robert C. Schubert (*pro hac vice* forthcoming)
Willem F. Jonckheer (*pro hac vice* forthcoming)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Tel: (415) 788-4220
rschubert@sjk.law
wjonckheer@sjk.law

*Attorneys for Plaintiff*

## VERIFICATION

I, Aviva Meyer, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Date: January 25, 2022                    _____

                                          Aviva Meyer